UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| TYCO HEALTHCARE GROUP LP d/b/a COVIDIEN, | : : : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| v. | : : | 3:11-cv-373 (CFD) |
| ADAM ROSS, | : : | |
| Defendant. | : | |

## RULING ON MOTION FOR PRELIMINARY INJUNCTION

Plaintiff Tyco Healthcare Group d/b/a/ Covidien ("Covidien") brings this motion for a preliminary injunction to enjoin its former employee, defendant Adam Ross, from sharing Covidien's confidential and proprietary business information with his new employer and Covidien's competitor, Intuitive Surgical ("Intuitive"). Ross worked as a design engineer in Covidien's research and development department until March 18, 2011, when he began a new job as a design engineer at Intuitive on March 21, 2011. Covidien argues Ross will divulge confidential and proprietary information if he continues to work at Intuitive, in violation of an agreement he signed with Covidien, and causing Covidien irreparable harm.

### I. Findings of Fact

### A. Ross's Employment History

Covidien is a manufacturer, distributor and servicer of medical devices. It is a limited partnership formed under Delaware law, with its principal place of business in Massachusetts. Specifically, Covidien develops minimally invasive, intelligently powered surgical products. Adam Ross, a Connecticut resident, worked for Covidien in its research and development department as a design engineer beginning on October 30, 2006. When Ross began at Covidien,

he entered into a non-compete agreement. On November 14, 2006, Ross signed the Employee Agreement Regarding Confidential Information, Inventions and Conflicting Employment. Ross agreed:

> I will not, either during or subsequent to my employment by you or any of your parent, subsidiaries, affiliates or divisions, successors or assigns, directly or indirectly divulge to any person or company, unless authorized by you in writing, any secret or confidential information as indicated above, whether acquired or developed by me or obtained from other of your employees.

Agreement, ¶ 2. DeSantis Aff. Ex. A., ECF No. 8-2. Ross also agreed that for two years after his employment with Covidien, he would not perform similar work for one of Covidien's competitors:

> During my employment and for a period of two years after it is terminated, I will not, within any geographic area with which my job responsibilities for the Company were concerned, render services similar to those performed by me at any time during my employment directly or indirectly to any person or company engaged in or about to be engaged in researching, developing, producing, marketing or selling any type of product relating to technology developed or acquired by [Covidien] with which I have become familiar during my term of employment with you. . . . [I]f, despite diligent and aggressive effort, I am unable to obtain employment consistent with my education or training solely because of the provision of this paragraph, such prohibition shall bind me only if and as long as you pay to me, after demand and your receipt of such accounting and evidence of the foregoing diligent and aggressive effort as you may request, a sum equal to my monthly base pay at termination for each such month of such unemployment during the period mentioned in this paragraph.

Agreement, ¶ 5.

Beginning in the winter of 2010, after approximately four years at Covidien, Ross began to look for a new job. He limited his job search to Connecticut. He applied to Intuitive Surgical after seeing a public advertisement, and was not solicited or recruited. From the beginning of his interviews with Intuitive Surgical, he informed Intuitive of his non-compete agreement, and consulted with an outside attorney about whether the job at Intuitive would violate the

2

agreement. On March 4, 2011, Ross informed his Covidien supervisors that he had taken a job with Intuitive, but did not believe he would be in violation of his non-compete agreement. When Covidien learned that Ross intended to move to Intuitive, his supervisor and an associate general counsel met with him on March 7 to advise him that Covidien planned to enforce the non-compete agreement. Ross responded that he nevertheless intended to join Intuitive Surgical.

On March 10, Covidien filed the complaint in this Court, but did not immediately serve the complaint on Ross. Instead, Covidien's legal department contacted Intuitive's legal department to discuss whether the issues could be resolved without litigation. Covidien said that no further litigation would be necessary if Intuitive Surgical would refrain from hiring Ross. Covidien stated that it would be willing to retain Ross as an employee, or, if Ross were unable to find work as an engineer at another company that does not compete with Covidien, it would be willing to compensate him per the terms of the agreement. At the time of his resignation, Ross was earning $79,000 per year, plus other benefits. Ross's last day of work at Covidien was March 18, 2011. Ross began working at Intuitive Surgical's office in Milford, Connecticut on March 21, 2011.

### B. Ross's Work at Covidien

As a design engineer, Ross worked on designing and developing medical devices. For several years at Covidien, Ross worked on multiple versions of a battery-powered disposable surgical stapler/cutter. Most recently, Ross served as a lead designer on a project to develop an "EGIA Adapter" to interface between a surgical stapler known as "Reload" and a handle known as "iDrive Ultra." The EGIA Adapter was to be part of a shaft that would connect into the iDrive handle, and would convert the rotary motion of the iDrive's electric motor into linear motion that

could be used by the Reload stapler. In the summer of 2010, Ross was assigned to work on optimizing the transmission of the EGIA Adapter to reduce wear and tear on the gears. The EGIA Adapter and the iDrive Ultra handle are not yet in the final design and testing phases, and will not be released to the market until at least late 2011.

### C. Current Work at Intuitive Surgical

Intuitive Surgical develops and sells robotic surgical systems. The key component in Intuitive Surgical's product line is the Endowrist. The Endowrist is a robotic device that allows a surgeon to manipulate an instrument in the same way one would manipulate one's wrist: bending up-and-down, left-to-right, clockwise and counterclockwise. Intuitive Surgical is developing two surgical instruments to be used in conjunction with the Endowrist. The first is known as the Radio Frequency Vessel Sealer, which is the project on which Ross now works. The Vessel Sealer is a cauterizing instrument which uses a high frequency current to seal off blood vessels. The second instrument is a surgical stapler. At Intuitive, Ross is only assigned to work on the RF Vessel Sealer, not the surgical stapler. All but one of the Intuitive Surgical employees working on the stapler are in Sunnyvale, California, and when he began at Intuitive Ross was instructed not to communicate with any of the employees on the surgical stapler project. Ross's work on the RF Vessel Sealer involves post-design manufacturability and assemblability tasks, because the RF Vessel Sealer is in a "design freeze" pending FDA approval.

## II. Conclusions of Law

Because the Court's jurisdiction is based on diversity of citizenship, Connecticut substantive law applies. However, "[t]he question of whether a preliminary injunction should be granted is generally one of federal law even in diversity actions, though state law issues are

4

sometimes relevant to the decision to grant or deny." Vbrick Systems, Inc. v. Stephens, No. 08-cv-1979, 2009 WL 1491489 at *5 (D. Conn. May 27, 2009) (Droney, J.) (internal citation omitted). In order for the court to grant a preliminary injunction, the party seeking the injunction must establish (1) a likelihood that it will experience irreparable harm in the absence of interim relief, and (2) either (a) a likelihood of success on the merits, or (b) the existence of a sufficiently serious question going to the merits to make them fair ground for litigation, and, additionally, that the balance of comparative hardships tips decidedly in its favor. See Federal Exp. Corp. v. Federal Espresso, Inc., 201 F.3d 168, 173 (2d Cir. 2000).

    A.    **Likelihood of Success on the Merits**

"In non-compete cases, such as this one, the irreparable harm analysis and the likelihood of success on the merits analysis are closely related and often conflated." International Business Machines Corp. v. Visentin, No. 11 Civ. 399, 2011 WL 672025 at *7 (S.D.N.Y. Feb. 16, 2011). The Court begins its analysis with the likelihood of Covidien's success on the merits of its breach of contract claim. Under Connecticut law, "[a] covenant that restricts the activities of an employee following the termination of his employment is valid and enforceable if the restraint is reasonable." New Haven Tobacco Co. v. Perrelli, 18 Conn.App. 531, 533 (1989). In determining whether a covenant is reasonable, Connecticut courts consider "(1) the length of time the restriction operates; (2) the geographic area covered; (3) the fairness of the protection afforded to the employer; (4) the extent of the restraint on the employee's opportunity to pursue his occupation; and (5) the extent of interference with the public's interest." Weiss & Associates, 208 Conn. at 529, n.2.

The non-compete agreement Ross signed meets these criteria for reasonableness. First,

the restriction operated for two years. Courts applying Connecticut law have upheld two-year non-compete restrictions as reasonable. See, e.g., Id. at 530–31; Minnesota Mining and Mfg. Co. v. Francavilla, 191 F. Supp. 2d 270, 280 (D. Conn. 2002) (holding two-year restriction was both reasonable and necessary to protect confidential and proprietary information). Second, the geographic area of Ross's non-compete agreement encompasses "any geographic area with[in] which any job responsibilities for the Company were concerned." Connecticut courts have upheld such "global" restrictive covenants when they are narrowly tailored to protect the company's business operations. See, e.g., Minnesota Mining, 191 F. Supp. 2d at 280–81 (upholding an agreement that protected the company "in the United States or in any country in which [it] has a plant for manufacturing a product upon which [the employee] worked"); Weiss & Associates, 208 Conn. at 531 (upholding an agreement that only protected the employer where it did business). Because Covidien is a worldwide manufacturer and distributor of surgical devices, the geographic restriction in the agreement is reasonable. Third, the restriction is fair because it only prevents Ross from working on products related to Covidien technology. Fourth, whether or not the restrictions unduly restrain Ross's opportunity to pursue his occupation is a closer question. However, because Covidien is still willing to employ Ross, or to pay him his former salary if he were unable to find another job, the agreement does not unduly restrict Ross's opportunity to work as an engineer. Finally, the agreement does not interfere with the public interest, but is narrow enough to further Covidien's legitimate business interest. For these reasons, the non-compete agreement is reasonable and enforceable.

The Court must next determine whether Ross's employment at Intuitive violates the agreement. Ross's employment agreement forbids him from "render[ing] services similar to

those" he performed at Covidien for one of Covidien's competitors, and from divulging Covidien's confidential and proprietary information. Covidien argues the work Ross did at Covidien is very similar to the work he will perform at Intuitive, and that given the nature of Ross's position at Intuitive, he will inevitably, even if inadvertently, disclose Covidien's confidential and proprietary information. At Covidien, Ross was a design engineer involved in the development of Covidien's powered medical devices used in minimally invasive surgeries. At Intuitive, Ross is a design engineer working also working on powered medical devices used in minimally invasive surgeries. Given these identical job titles and the fact that Covidien and Intuitive are competitors, Covidien contends Ross is in violation of his non-compete agreement.

However, Ross argues that when viewed in more specific detail, his work at Intuitive is dissimilar from the work he did at Covidien, and that he will have no occasion to disclose any of Covidien's confidential information. First, Ross argues that the iDrive Ultra stapler on which he worked at Covidien is not similar to the RF Vessel Sealer on which he works at Intuitive. The Covidien stapler is a reusable, hand-held device, while the RF Vessel Sealer is a single-use disposable attachment to a complex robotic system. Although Intuitive is also producing a stapler device, that work is being done in California and Intuitive has instructed Ross that he will not work on the stapler. Second, Ross argues that his work on each device is substantially different. Ross worked on the design of two disposable staplers and one powered stapler at Covidien; at Intuitive Ross is involved in the post-design phase of the RF Vessel Sealer, and will be working on assemblability and manufacturability tasks. Finally, Ross argues the relevant technology of the devices is dissimilar. Covidien's stapler required that rotary motion be converted to linear motion proximal to, or before, the joint between the handle and the stapler,

7

while the RF Vessel Sealer requires that rotary motion be converted to linear motion distal to, or after, the Endowrist joint. Also, Ross worked on highly-loaded metal gears at Covidien, while he will be working on the manufacturability of lightly-loaded plastic gears for Intuitive. Given these differences, Ross argues, any information he learned at Covidien that could be considered confidential or proprietary is irrelevant to his current work at Intuitive.

When Ross's daily responsibilities at Covidien and Intuitive are compared in this way, it is not obvious that Ross will perform for Intuitive "services similar" to those he performed at Covidien, or that he will inevitably disclose any of Covidien's confidential information. Ross spent his time at Covidien working on surgical staplers, and he has been prohibited from working on Intuitive's surgical stapler. At Covidien, Ross spent much of his time working on an adapter that would convert rotary motion to linear motion distal to the stapler's joint. Such an adapter would be incompatible with Intuitive's Endowrist devices. Furthermore, the product on which Ross will work at Intuitive, the RF Vessel Sealer, is in a "design freeze," and Intuitive is now working toward FDA approval and commercialization of the product. Therefore, Ross will work on making the manufacture and assembly of the product more efficient. Even if Ross possesses any confidential and proprietary information from Covidien relevant to the RF Vessel Sealer, there is little likelihood he would have an opportunity to utilize such information at this point in time.

For these reasons, the Court concludes that Covidien has failed to satisfy its burden of showing that it is likely to succeed on the merits. Though it may ultimately prevail in a later stage of this litigation, at this time Covidien has not shown that Ross's work at Intuitive violates his agreement with Covidien.

**B.     Existence of Sufficiently Serious Question Going to the Merits**

As an alternative to demonstrating a likelihood of success on the merits, the party seeking a preliminary injunction may show both the existence of a sufficiently serious question going to the merits, as well demonstrate that the balance of comparative hardships tips decidedly in its favor.  Here, while Covidien has fallen short of showing it is likely to succeed on the merits, it has raised sufficiently serious questions about whether Ross's work at Intuitive constitutes a breach of his non-compete agreement.  Ross's positions at both companies—design engineer—are identical, and it is conceded that Covidien and Intuitive are direct competitors.  This evidence alone raises sufficiently serious questions going to the merits of the case.

**C.     Balance of Comparative Hardships**

The Court finds the balance of hardships tips in favor of Ross.  Were a preliminary injunction to be granted, Ross would lose his job.  Although Covidien has stated that it would be willing to compensate Ross with pay equal to his most recent base salary at Covidien should he be unable to find another suitable position, such an arrangement would nevertheless take Ross out of the dynamic, competitive field of biomedical engineering for a period of years.  Also, although Covidien has stated it would be willing to re-hire Ross, it may be difficult for Ross to re-join Covidien given the pendency of this lawsuit,  As for Covidien, it argues that if a preliminary injunction is not granted, Ross will, at some future point, inevitably disclose confidential and proprietary information.  Exactly what that information is and how it will harm Covidien is not obvious.  Given the speculative nature of any hardship that would befall Covidien in the absence of a preliminary injunction, and the very concrete hardship Ross would face were it to issue, the Court find the balance of the hardships tips in Ross's favor.

### D. Likelihood of Irreparable Harm

Because Covidien cannot show either a likelihood of success on the merits, or both a substantial question going to the merits and the balance of hardships in its favor, a preliminary injunction will issue. Therefore, the Court need not decide whether Covidien has met its burden of showing a likelihood of irreparable harm.

### III. Conclusion

Covidien has failed to show that it is likely to succeed on the merits of this case. Although Covidien and Intuitive are direct competitors, Covidien has not sufficiently demonstrated to the Court that Ross is performing "similar services" at Intuitive, or that he will inevitably use and disclose confidential and proprietary information, in violation of his non-compete agreement. While Ross's employment at Intuitive does raise sufficiently serious questions going to the merits to make them fair ground for litigation, the balance of the hardships tips in Ross's favor. For these reasons, the plaintiff's motion for a preliminary injunction [Dkt. #8] is DENIED.

SO ORDERED this 10th day of May 2011, at Hartford, Connecticut.

/s/ Christopher F. Droney
**CHRISTOPHER F. DRONEY**
**UNITED STATES DISTRICT JUDGE**